# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                                   **Case No. 14-CR-78**

**DEMERIUS SHOLAR**
    **Defendant.**

## STATEMENT OF REASON MEMORANDUM

Defendant Demerius Sholar pleaded guilty to cocaine distribution, contrary to 21 U.S.C. § 841(a)(1) & (b)(1)(C), and I set the case for sentencing. In imposing sentence, the district court must first determine the defendant's imprisonment range under the guidelines, then make an individualized assessment of the appropriate sentence based on the factors set forth in 18 U.S.C. § 3553(a). E.g., United States v. Kappes, 782 F.3d 828, 837 (7th Cir. 2015).

### I. GUIDELINE CALCULATION

Defendant's pre-sentence report ("PSR") set a base offense level of 30 based on a relevant conduct drug weight of 5-15 kilograms of cocaine, U.S.S.G. § 2D1.1(c)(5), then subtracted 3 levels for acceptance of responsibility, U.S.S.G. § 3E1.1, for a final level of 27. The PSR further calculated a criminal history category of III, producing an imprisonment range of 87-108 months. I adopted these calculations without objection.

### II. SECTION 3553(a)

**A.    Sentencing Factors**

Section 3553(a) directs the sentencing court to consider:

(1)    the nature and circumstances of the offense and the history and

characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory sentencing guideline range;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After considering these factors, the court must impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation of the defendant. Id.

While the court must as part of the analysis consider the type and range of sentence recommended by the guidelines, it "may not perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case." United States v. Warner, 792 F.3d 847, 855 (7th Cir. 2015). "Ultimately, it falls on the district court to weigh and balance the various factors and to 'make an individualized assessment based on the facts presented.'" Id. (quoting Gall v. United States, 552 U.S. 38, 50 (2007)).

**B.    Analysis**

**1.    The Offense**

This prosecution arose out of the government's investigation of the Kevin R. Arms racketeering enterprise, which engaged in drug trafficking, money laundering, and gambling, as well as acts of violence. This defendant was involved in the drug trafficking aspect. The specific offense of conviction occurred on March 19, 2012, when a confidential source working with law enforcement purchased 46 grams of cocaine from defendant for $2200.

According to a source of information, defendant was one of Arms's most significant distributors of cocaine, receiving one or two kilograms each delivery. Another source stated that Arms fronted defendant ounces of cocaine, which would be repaid after the cocaine was distributed. This source believed defendant was receiving ½ to one kilogram of cocaine a week from Arms. However, in the spring of 2013, defendant's residence was robbed, and the suspects obtained four pounds of marijuana and ½ kilogram of cocaine from defendant. As a result of this robbery, Arms stopped supplying defendant with cocaine. Other sources corroborated these statements, estimating that defendant received approximately 10 kilograms of cocaine from Arms until the break-in at defendant's residence in early 2013. Defendant admitted that the amount attributable to him as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, was more than 5 but less than 15 kilograms of cocaine. He indicated that he became involved in drug trafficking because he was an acquaintance of Kevin R. Arms, with whom he gambled. Arms asked him to become involved in dealing in order to earn money, and defendant agreed. Defendant expressed remorse and regret for his decision.

### 2. The Defendant

At thirty-one years old, defendant had a fairly modest prior record: cocaine possession in 2002, at age 17, for which he initially received probation but later served one year in jail on revocation; possession of THC – second offense in 2004, for which he was again sentenced to probation, but again revoked, serving one year and one month in prison; possession of cocaine – second offense in 2007, serving 12 months in jail for that offense; and, finally, a municipal retail theft case in 2015, an offense he committed while on bond in this case. Defendant otherwise did well on bond in this case, aside from a few minor violations of location monitoring, missed drug screens in October 2014 and January 2015, and a positive screen for marijuana in January 2015.

The most significant aspect of defendant's history and characteristics was his health. He had suffered from kidney problems since childhood, but these problems had significantly worsened in the past three years. He had been diagnosed with end stage renal disease, requiring dialysis three times per week (4-½ hours per session), and needed a kidney transplant. The treating nephrologist reported complications with defendant's treatment, requiring the involvement of a vascular surgeon. Defendant also suffered from atrial fibrillation, high blood pressure, and sleep apnea.

Defendant graduated from high school in 2003 and reported working through Goodwill from 2001 to 2006. He now received disability benefits related to his kidney disease. He had two children, ages six and seven, and reported being active in their lives. The court also received a number of positive letters, indicating that defendant was a good father and that he had been involved in volunteer work, mentoring at risk youth in the community since his release on bond in this case.

4

### 3. The Sentence

The government recommended a sentence of 84 months in prison, stressing the seriousness of the offense and the need to deter defendant from further involvement with drugs. Defendant requested a term of supervision with home confinement, based primarily on his serious health problems. Defendant's nephrologist questioned whether the Bureau of Prisons could adequately address defendant's medical needs and indicated that defendant would not be eligible for a kidney transplant during a prison term.[1] A BOP doctor responded that the Bureau provides dialysis for inmates and could, if an eligible match were found, perform a transplant. On review of the medical information provided, I concluded that the BOP likely could keep defendant alive during a prison sentence. I nevertheless concluded that a prison term was not necessary in this case.

First, I saw no need for prison to protect the public from further crimes of the defendant or to deter him from further violations of law. While defendant had a prior record, it consisted primarily of possession offenses; he did not have a history of violence, weapons offenses, or prior drug distribution cases. More importantly, defendant committed those crimes – and engaged in the instant offense conduct – before his health significantly worsened in early 2015. Given his current symptoms, including significant fatigue, I found it unlikely he would return to drug-related activity. The record contained no evidence that he had engaged in such activity since 2013, when his involvement in the instant offense ended. I further took into account defendant's positive contributions to the community, as reflected in the letters, and his generally good performance on pre-trial release. Supervision in the community could ensure

---

[1]The doctor also indicated that the risk of contracting Hepatitis is very high in the prison population, further diminishing defendant's chances of receiving a kidney transplant.

that defendant remained law abiding.

Second, while the offense was serious, there was nothing aggravated about defendant's particular conduct. He did not carry a gun or engage in violence like some of the others affiliated with the enterprise. Given the seriousness of his health conditions, I found that a lengthy period of home confinement would be as efficient, and less costly, than imprisonment as a form of punishment. See U.S.S.G. § 5H1.5.

Finally, given defendant's peculiar circumstances, I determined that imposition of a community-based sentence would not create unwarranted disparity or fail to promote general deterrence. Defendant's doctor indicated that, based on studies, the average five-year mortality rate for patients on hemodialysis is 60%, meaning out of ten people on hemodialysis six would be dead at the end of five years.[2] It seemed unlikely a similarly situated co-defendant would want to trade places with defendant.

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for a period of time served, followed by three years of supervised release with a condition of one year home confinement and other terms appearing in the judgment.

Dated at Milwaukee, Wisconsin, this 11th day of May, 2017

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[2] A transplant could add an average of 10-15 years to the life expectancy, according to the nephrologist.

6